UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                              Case No.

   v.                                    Hon.
                                           U.S. District Judge

JAMES A. HARVEY; GREAT LAKES THERAPY
HOUSECALLS, P.C.; and GREAT LAKES HOME
HEALTHCARE SPECIALISTS, LLC,

        Defendants.

_____/

## COMPLAINT

     The United States of America, by its counsel, Andrew B. Birge, United States Attorney for the Western District of Michigan, and Andrew J. Hull and Ryan D. Cobb, Assistant United States Attorneys, states the following as its Complaint against the Defendants:

### I.  INTRODUCTION

     1.      The Medicare Program is premised on a system of trust between healthcare providers and the government.  The providers certify that they will comply with Medicare's rules and policies governing coverage of healthcare services to Medicare beneficiaries and only submit reimbursement claims for medically reasonable and necessary services.  The providers also promise that they will only bill Medicare for services that they actually performed and that they will submit true and accurate claims for reimbursement of the services they provide.  Based on this system of trust, Medicare pays the healthcare providers for healthcare services provided to Medicare beneficiaries upon the submission of claims for reimbursement by the providers.  Each

year, Medicare expends hundreds of billions of dollars, including the reimbursement of services billed by healthcare providers.[1]

2. The Defendants—James A. Harvey, Great Lakes Therapy Housecalls, P.C., and Great Lakes Home Healthcare Specialists, LLC—broke that system of trust.

3. As described in more detail below, the Defendants lied to Medicare by submitting claims for services they did not perform.  The Defendants falsified medical records and claims to affect payment by Medicare.  And the Defendants submitted Medicare claims that they knew did not comply with Medicare regulations and that were not medically reasonable or necessary.

4. Because of the Defendants' pattern of broken trust, Medicare paid the Defendants hundreds of thousands of dollars for the fraudulent claims the Defendants submitted.

5. This action brought under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and common law theories of fraud and unjust enrichment, seeks to recover those damages—and the statutory treble multiplier and civil penalties—on behalf of the government.

## II. JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355(a), and 1367(a).  The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

7. Venue is proper in the Western District of Michigan pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because the Defendants transacted business and resided in this District, and because the Defendants committed acts in violation of 31 U.S.C. § 3729 within this District.  At all relevant times, Defendants Great Lakes Therapy Housecalls, P.C., and Great Lakes

---

[1] *See* 2020 Annual Report of the Boards of Trustees of the Federal Hospital Insurance & Federal Supplementary Medical Insurance Trust Funds, at 6, *available at* https://www.cms.gov/files/document/2020-medicare-trustees-report.pdf.

Home Healthcare Specialists, LLC, were registered businesses in Traverse City, Michigan, and Defendant James A. Harvey operated both businesses and was a resident of Grand Traverse County, Michigan.

## III.  THE PARTIES

8.      The United States brings this action on behalf of the United States Department of Health and Human Services ("HHS"), including its component, the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare Program.

9.      Defendant *James A. Harvey* ("James Harvey") is a resident of Grand Traverse County, Michigan, and owns and operates Defendants Great Lakes Therapy Housecalls, P.C., and Great Lakes Home Healthcare Specialists, LLC.  James Harvey is also a licensed physical therapist in the State of Michigan.

10.      Defendant *Great Lakes Therapy Housecalls, P.C.* ("GLTH"), is a Michigan domestic professional corporation located at 1650 Barlow Street #11, Traverse City, Michigan 49686.  GLTH was incorporated in November 2003 as a provider of physical and occupational therapy services, many of which it bills to the Medicare Program.  James Harvey is the president, treasurer, secretary, and director of GLTH.

11.      Defendant *Great Lakes Home Healthcare Specialists, LLC* ("GLHHS"), is a Michigan domestic limited liability company located at 1650 Barlow Street, Traverse City, Michigan 49686.  GLHHS was organized in 2014 as a home healthcare agency, and bills much of its work to the Medicare Program.  James Harvey is the sole member and president of GLHHS.

## IV.  THE MEDICARE PROGRAM

12.      In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, known as the Medicare Program, to pay for the costs of certain healthcare items and services.  42

U.S.C. § 1395, *et seq.*  Entitlement to Medicare benefits is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426 to 426-1.

13.     HHS is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.

14.     As relevant to this action, the Medicare Program is divided into several parts, including Medicare Part A and Medicare Part B.

**A.  Medicare Part A and Home Health Services**

15.     Medicare Part A authorizes payment for institutional care, including home health care.  *See* 42 U.S.C. § 1395c.  Services covered under Medicare Part A's home health care benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or intermittent skilled home health aide services, and—as pertinent to this action—medical social services.  *See* 42 U.S.C. § 1395x(m).

16.     Medicare pays Part A home health providers, referred to as home health agencies, under what is known as the Prospective Payment System ("PPS").

17.     At all times relevant to this action, Medicare payments under the PPS are based upon sixty-day "episodes" of care.  The PPS rate is intended to reimburse the home health agency for all reasonable and necessary nursing and therapy services, routine and non-routine medical supplies, and home health aide and medical social services required for the care of an individual patient during that sixty days.  The amount of the payment for each sixty-day episode of care is adjusted to account for the patient's health condition, clinical characteristics, and service needs.

18.     Home health agencies submit claims to the Medicare Part A program for reimbursement of home health services provided to Medicare beneficiaries.

19.    The United States provides reimbursement for Medicare Part A claims from the Medicare Trust Fund through CMS.  To assist in the administration of the Medicare Part A program, CMS contracts with Medicare Administrative Contractors ("MACs").   42 U.S.C. § 1395h.  MACs are responsible for processing the payment of Medicare Part A claims to providers on behalf of CMS.

20.    Wisconsin Physicians Service Government Health Administrators ("WPS"), is the MAC that processes home health-related claims under Medicare Part A on behalf of CMS for the State of Michigan.

21.    As a condition of participation in Medicare's Part A home health program, federal law requires that all necessary skilled professional services provided by the home health agency be "authorized, delivered, and supervised only by health care professionals who meet the appropriate qualifications" specified in CMS regulations.  42 C.F.R. § 484.75(a).

22.    As relevant to this action, and as a condition of participation in Medicare's Part A home health program, medical social work must be completed by a "social worker" who must have "a master's or doctoral degree from a school of social work accredited by the Council on Social Work Education, and [have] 1 year of social work experience in a health care setting."  42 C.F.R. § 484.115(m).

23.    Additionally, in order for home health services to be eligible for Medicare coverage and payment, a physician must certify the patient's eligibility for the home health services through a face-to-face patient encounter, a condition of payment under Medicare Part A.  42 C.F.R. § 424.22(a)(1).

24.    The required certification of need for home health services must be obtained at the time a plan of care is established for the patient or as soon thereafter as possible.  The certification must be signed and dated by the physician who establishes the plan of care.  *Id.* § 424.22(a)(2).

25.    The physician must also recertify the patient's eligibility at least every sixty days if there is a continuous need for home health care after an initial 60-day episode.  The physician or other allowed practitioner must sign and date the recertification at the time the plan of care is reviewed.  *Id.* § 424.22(b)(1).

**B.    Medicare Part B and Outpatient Physical / Occupational Therapy Services**

26.    Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for a variety of outpatient "medical and other services," including certain physical therapy and occupational therapy services.  *See* 42 U.S.C. §§ 1395j–1395w-5.

27.    Medicare generally reimburses only those items and services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(l)(A).

28.    As relevant to this action, a provider of physical therapy or occupational therapy services submits claims to the Medicare Part B program for reimbursement of services provided to Medicare beneficiaries.

29.    The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS.  To assist in the administration of the Medicare Part B Program, CMS contracts with MACs.  42 U.S.C. § 1395u.  MACs are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

30.    WPS is the MAC that processes physical and occupational therapy claims under Medicare Part B on behalf of CMS for the State of Michigan.

31.     Medicare allows the provision of physical or occupational therapy services provided by a physical therapist assistant ("PTA") or occupational therapist assistant ("OTA"), but only if the PTA or OTA is appropriately supervised by a licensed physical therapist ("PT") or occupational therapist ("OT").

32.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury.  Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums.

**C.  Procedure and Service Codes**

33.     The American Medical Association ("AMA") assigns and publishes numeric codes, known as the Current Procedural Terminology ("CPT") and Healthcare Common Procedure Coding System ("HCPCS") codes.  The codes are a systematic listing, or universal language, used to describe the procedures and services performed by healthcare providers.  Healthcare providers use CPT and HCPCS codes on claim forms or electronic claims to describe, and claim reimbursement for, the services provided to Medicare beneficiaries.

34.     The procedures and services represented by the CPT and HCPCS codes include codes for physical and occupational therapy.  Healthcare providers use CPT and HCPCS codes to describe the services rendered in their claims for reimbursement to healthcare benefit programs, including Medicare Part B.

35.     As pertinent to this action, providers of physical and occupational therapy services utilize a number of CPT and HCPCS codes to represent the therapy services provided on a claim submitted to Medicare.  These codes include the following:

a.      CPT Code 97530: "Therapeutic activities, direct (one-on-one) patient contact (use of dynamic activities to improve functional performance), each 15 minutes."  AMA, *Current Procedural Terminology* at 629 (prof. ed. 2015).

b.      CPT Code 97110: "Therapeutic procedure, 1 or more areas, each 15 minutes; therapeutic exercises to develop strength and endurance, range of motion and flexibility." *Id.* at 628.

c.      CPT Code 97116: "[G]ait training (includes stair climbing)."  *Id.* Depending on the amount of time spent on any given service, the provider bills a number of units that correspond to each code.

### D.  Medicare Enrollment & Agreement to Comply with Medicare Regulations

36.      To provide services under Medicare's Part A and Part B programs, providers—like the Defendants—must enroll with Medicare.  As part of the enrollment process, providers must complete and submit an enrollment form to Medicare.

37.      On December 10, 2003, James Harvey signed an application to enroll and bill the Medicare program as an individual practitioner.  As part of that enrollment application, Mr. Harvey certified the following:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on my compliance with any applicable conditions of participation in Medicare.
> …
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

38.     On July 23, 2014, James Harvey signed the enrollment application for GLHHS

certifying that GLHHS similarly would abide by the Medicare laws, regulations, and program

instructions and that GLHHS would not present or cause the submission of false or fraudulent

claims for payment by Medicare.

## V.  THE FALSE CLAIMS ACT

39.     The False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides for the award of

treble damages and civil penalties for, among other things, knowingly causing the submission of

false or fraudulent claims for payment to the United States Government.

40.     The FCA provides, in pertinent part:

(a) LIABILITY FOR CERTAIN ACTS.—

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a
false record or statement material to a false or fraudulent
claim; . . . or

(G) knowingly makes, uses, or causes to be made or used, a
false record or statement material to an obligation to pay or
transmit money or property to the Government, or
knowingly conceals or knowingly and improperly avoids or
decreases an obligation to pay or transmit money or
property to the Government,
. . .
is liable to the United States Government for a civil penalty
of not less than $5,000 and not more than $10,000, as
adjusted by the Federal Civil Penalties Inflation Adjustment
Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410),
plus 3 times the amount of damages which the Government
sustains because of the act of that person.

* * *

(b) DEFINITIONS.—For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud . . . .

31 U.S.C. § 3729.

41.     The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.

42.     First, a defendant violates the FCA when the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Under the FCA, a claim includes a request for money.  *Id*. § 3729(b)(2).  Further, a claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

43.     Second, a defendant violates the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

44.     Third, a defendant violates the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

## VI.  FACTS

### A.  Background

45.     James Harvey is the owner of both GLTH and GLHHS.  At all times relevant, GLTH was a provider of physical and occupational therapy services, including therapy services provided to Medicare beneficiaries at their homes under Medicare Part B.  At all times relevant, GLHHS was a home health agency that provided home healthcare services to homebound Medicare beneficiaries under Medicare Part A.

46.     Both GLTH and GLHHS are located in Traverse City, Michigan, and service Medicare patients in Traverse City and the greater Traverse City area.

### B.  In 2004, James Harvey Directed a GLTH Employee to Falsely Add Additional Billing Units to Claims Submitted to Medicare for Therapy Services.

47.     At GLTH, physical and occupational therapy providers recorded the therapy services provided, along with the corresponding number of units of each service, on a therapy progress note, which they completed following a therapy visit at the patient's home.

48.     GLTH therapy providers further documented their work on a daily billing chart. The daily billing chart identified each patient seen that day and recorded the service provided (identified by the CPT code) and number of units billed for each service.

49.     The claims for physical and occupational therapy services GLTH submitted to Medicare must appropriately reflect both the service and amount of each service provided by the GLTH therapist and should accurately reflect GLTH's files, including the therapy progress notes and the daily billing charts.

50.     However, in or around 2008, James Harvey instructed one of GLTH's employees, Employee 1,[2] to add additional billing units to claims for services rendered to Medicare beneficiaries.  More specifically, James Harvey directed Employee 1 to add an additional billing unit of CPT Code 97530—used to identify a fifteen-minute unit of one-on-one therapeutic activities—to claims for physical and occupational therapy services submitted to Medicare.

51.     Adding an additional unit of CPT Code 97530 falsely indicated that GLTH provided additional therapy services to the Medicare beneficiary over and above what it actually provided.

52.     At James Harvey's direction, Employee 1 began to add additional units of time under CPT Code 97530 to GLTH's claims to Medicare for the physical and occupational therapy services GLTH provided.

53.     GLTH then submitted these false claims to Medicare for reimbursement.  Because Medicare relied on GLTH to submit accurate claims, Medicare paid for these additional units of therapeutic activities (CPT Code 97530) that never actually took place, typically resulting in approximately $23.00 in additional payment to GLTH for each of those claims.

54.     Between at least August 4, 2010, through March 31, 2015, GLTH submitted to Medicare hundreds of claims for reimbursement of physical and occupational therapy services that falsely added additional units of therapy services rendered, including the following examples:

        a.      GLTH's medical records indicate that a GLTH physical therapist assistant provided physical therapy services to Medicare beneficiary J.A.[3] on December 26, 2012.  The

---

[2] The United States previously provided the name of this employee to Defendants, but, for purposes of this public filing, is identifying him as "Employee 1" to protect his privacy, including his employment history.

[3] To protect the privacy of individual patients, this Complaint identifies each Medicare beneficiary only by their first and last initials.  To the extent Defendants need more specificity to identify the claims at issue, the United States can provide the full patient names under a protective order.

therapy progress note for the therapy visit to J.A. states that the physical therapist assistant provided the following four units of therapy: Therapeutic Activities (one unit); Therapeutic Exercises (two units); and Gait Training (one unit).   The physical therapist assistant's corresponding daily billing chart for December 26, 2012, further reflects that the physical therapist assistant provided the following four units of therapy for J.A.:  Therapeutic Activities (97530) (one unit); Therapeutic Exercises (97110) (two units); and Gait Training (97116) (one unit).   For purposes of this specific example, the following figures are copies of the therapy progress note (Figure 1) and daily billing chart (Figure 2) at issue.

*Figure 1: Patient J.A.'s Therapy Progress Note for December 26, 2012*



*Figure 2: Therapist's Daily Billing Sheet for December 26, 2012*

| Patient Name | Initial Evaluation (97001) | Re-Evaluation (97002) | Ther. Activities (97530) | Ther. Exercise (9110) | Gait Training (97116) | Manual Therapy (97140) | Neuro Re-Ed (97112) | Ultrasound (97035) | ICD-9 CODE | Patient # |
|---|---|---|---|---|---|---|---|---|---|---|
| ███████ | | | 1 | 2 | 1 | | | | 728.87 781.2 | 2864 |

Despite the fact that the GLTH physical therapist assistant only provided four units of therapy services to J.A. on December 26, 2012, GLTH falsely added an additional unit of Therapeutic Activities (CPT Code 97530) for a total of five units of physical therapy to the claim (Claim No. 681813004177500) it submitted to Medicare for reimbursement of the physical therapy services GLTH provided to J.A. on that date of service, for a total paid claim amount of $110.78.  This claim was false.  It also resulted in an overpayment of approximately $23.00 to GLTH.   For purposes of this specific example, Figure 3 reflects the CPT codes and corresponding units GLTH submitted in its claim to Medicare for the physical therapy services provided to J.A. on December 26, 2012.

*Figure 3: Excerpt from Medicare Claim (No. 681813004177500) for Physical Therapy Services Purportedly Rendered to J.A. on December 26, 2012*

| Beneficiary | Date of Service | CPT Code | Units Billed | Amount Paid |
|---|---|---|---|---|
| J.A. | 12/26/2012 | 97110 | 2 | $42.78 |
| J.A. | 12/26/2012 | 97530 | 2 | $48.98 |
| J.A. | 12/26/2012 | 97116 | 1 | $19.02 |

b.      GLTH's medical records indicate that a GLTH physical therapist assistant provided physical therapy services to Medicare beneficiary A.U. on June 17, 2014.  The therapy progress note for the therapy visit to A.U. states that the physical therapist assistant provided the following three units of therapy: Therapeutic Activities (one unit); Therapeutic Exercises (one unit); and Gait Training (one unit).  The physical therapist assistant's corresponding daily billing chart for June 17, 2014, further reflects that the physical therapist assistant provided the following three units of therapy for A.U.:  Therapeutic Activities (97530) (one unit); Therapeutic Exercises (97110) (one unit); and Gait Training (97116) (one unit).  Despite the fact that the GLTH physical therapist assistant only provided three units of therapy services to A.U. on June 17, 2014, GLTH falsely added an additional unit of Therapeutic Activities (CPT Code 97530) for a total of four

units of physical therapy to the claim (Claim No. 681914170294980) it submitted to Medicare for reimbursement of the physical therapy services GLTH provided to A.U. on that date of service, for a total paid claim amount of $162.10 (this claim also included services provided on June 12, 2014).  This claim was false.  It also resulted in an overpayment of approximately $23.00 to GLTH.

c.      GLTH's medical records indicate that a GLTH physical therapist assistant provided physical therapy services to Medicare beneficiary A.U. on September 16, 2014.  The therapy progress note for the therapy visit to A.U. states that the physical therapist assistant provided the following three units of therapy: Therapeutic Activities (one unit); Therapeutic Exercises (one unit); and Gait Training (one unit).  The physical therapist assistant's corresponding daily billing chart for September 16, 2014, further reflects that the physical therapist provided the following three units of therapy for A.U.:  Therapeutic Activities (97530) (one unit); Therapeutic Exercises (97110) (one unit); and Gait Training (97116) (one unit).  Despite the fact that the GLTH physical therapist assistant only provided three units of therapy services to A.U. on September 16, 2014, GLTH falsely added an additional unit of Therapeutic Activities (CPT Code 97530) for a total of four units of physical therapy to the claim (Claim No. 681914265514940) it submitted to Medicare for reimbursement of the physical therapy services GLTH provided to A.U. on that date of service, for a total paid claim amount of $145.54 (this claim also included services provided on September 11, 2014).  This claim was false.  It also resulted in an overpayment of approximately $23.00 to GLTH.

d.      GLTH's medical records indicate that a GLTH physical therapist assistant provided physical therapy services to Medicare beneficiary J.P. on March 11, 2015.  The therapy progress note for the therapy visit to J.P. states that the physical therapist assistant provided the following four units of therapy: Therapeutic Activities (one unit); Therapeutic Exercises (two

units); and Gait Training (one unit).  The physical therapist assistant's corresponding daily billing chart for March 11, 2015, further reflects that the physical therapist assistant provided the following four units of therapy for J.P.:  Therapeutic Activities (97530) (one unit); Therapeutic Exercises (97110) (two units); and Gait Training (97116) (one unit).  Despite the fact that the GLTH physical therapist assistant only provided four units of therapy services to J.P. on March 11, 2015, GLTH falsely added an additional unit of Therapeutic Activities (CPT Code 97530) for a total of five units of physical therapy to the claim (Claim No. 681915082379150) it submitted to Medicare for reimbursement of the physical therapy services GLTH provided to J.P. on that date of service, for a total paid claim amount of $199.74 (this claim also included services provided on March 9, 2015).  This claim was false.  It also resulted in an overpayment of approximately $23.00 to GLTH.

55.     In addition to the specific false and fraudulent claims identified above, GLTH knowingly submitted hundreds of false and fraudulent claims to Medicare that included the additional units of therapeutic activities services identified by CPT Code 97530 added by GLTH staff at the direction of James Harvey.  As a result, from at least August 4, 2010, through March 31, 2015, GLTH submitted hundreds of false claims to Medicare, and Medicare paid GLTH for additional units of therapy that never took place.

**C. In 2013, GLTH Submitted Claims to Medicare That Falsely Asserted Certain Physical Therapy Services Had Been Supervised by a Physical Therapist While She Was Out on Maternity Leave.**

56.     At GLTH, many of the physical therapy services it provided to Medicare beneficiaries were performed by physical therapist assistants (or "PTAs") at the beneficiaries' homes.

16

57.     Medicare will cover, or reimburse, the provision of physical therapy services provided by PTAs, but only if the PTAs are appropriately supervised by a physical therapist (or "PT").  The amount of supervision necessary differs depending on the setting of the therapy and the type of therapy provider.

58.     However, certain physical therapy services may only be personally performed by a PT, and cannot be delegated to a PTA, regardless of whether the PTA is being supervised.  For example, PTAs may not provide evaluative or assessment services, make clinical judgments or decisions, or take responsibility for the service.

59.     In 2011, GLTH hired Employee 2[4] as a physical therapist.

60.     As part of her responsibilities, Employee 2 supervised the provision of physical therapy services by GLTH PTAs.  GLTH billed Medicare under Employee 2's name and Medicare credentials for physical therapy services that PTAs provided to Medicare beneficiaries under Employee 2's supervision.

61.     From on or about April 25, 2013, to July 1, 2013, Employee 2 was on maternity leave from GLTH.

62.     However, during that same time period, GLTH continued to submit claims for reimbursement to Medicare for physical therapy services PTAs provided, falsely submitting these claims under Employee 2's name and Medicare credentials, even though she was not providing any level of supervision while she was out on maternity leave.

63.     Additionally, GLTH utilized a signature stamp, which it used to "sign" physical therapy records with Employee 2's "signature."  Using this signature stamp, GLTH falsified the

---

[4] The United States previously provided the name of this employee to Defendants, but, for purposes of this public filing, is identifying her as "Employee 2" to protect her privacy, including her employment and medical history.

underlying physical therapy records used to support its submission of false claims to Medicare, representing that these physical therapy services were performed under Employee 2's supervision.

64.     For services rendered from April 25, 2013, to July 1, 2013, GLTH submitted dozens of false claims to Medicare for reimbursement of physical therapy services GLTH PTAs purportedly performed under Employee 2's supervision when, in fact, Employee 2 was on maternity leave and did not provide any level of supervision to the PTAs.  These include the following examples:

a.     On May 9, 2013, a GLTH PTA provided physical therapy services to Medicare beneficiary L.L.  GLTH then submitted a claim (Claim No. 681913137242220) for these physical therapy services to Medicare under Employee 2's name and Medicare credentials, falsely representing that Employee 2 had supervised these services.  This claim was false.  In total for this claim, Medicare paid GLTH $97.99 for these unsupervised and falsely-billed services.

b.     On May 13, 15, and 17, 2013, a GLTH PTA provided physical therapy services to Medicare beneficiary D.S.   GLTH then submitted a claim (Claim No. 681913144354470) for these physical therapy services to Medicare under Employee 2's name and Medicare credentials, falsely representing that Employee 2 had supervised these services. Additionally, the underlying records indicate that the PTA performed two separate re-evaluations of D.S. on May 13 and 15, 2013, which must be personally performed by the PT, but the submitted Medicare claim indicates that Employee 2 performed these re-evaluation services (identified by CPT Code 97002).  This claim was false.  In total for this claim, Medicare paid GLTH $289.00 for these unsupervised and falsely-billed services.

c.     On May 14 and 16, 2013, a GLTH PTA provided physical therapy services to Medicare beneficiary A.C.  GLTH then submitted a claim (Claim No. 681913144354410) for

these physical therapy services to Medicare under Employee 2's name and Medicare credentials, falsely representing that Employee 2 had supervised these services.  Additionally, the underlying records indicate that the PTA performed a re-evaluation of A.C. on May 16, 2013, which must be personally performed by the PT, but the submitted Medicare claim indicates that Employee 2 performed this re-evaluation service (identified by CPT Code 97002).  This claim was false.  In total for this claim, Medicare paid GLTH $184.48 for these unsupervised and falsely-billed services.

65.    In addition to the specific false and fraudulent claims identified above, GLTH knowingly submitted dozens of false and fraudulent claims to Medicare that indicated that Employee 2 supervised certain physical therapy services, while, in fact, she was on maternity leave and did not provide any level of supervision to the PTAs who actually performed the therapy services.  As a result, for certain physical therapy services rendered from April 25, 2013, through July 1, 2013, GLTH submitted dozens of false claims to Medicare under Employee 2's name and Medicare credentials, and Medicare paid GLTH for those false claims.

**D.  GLHHS Knowingly Employed an Unqualified and Unlicensed Individual to Perform Medical Social Services and Falsely Submitted Claims to Medicare for Services Performed by That Individual.**

66.    As explained above, James Harvey's other business, GLHHS, was a home health agency that provided home health services to homebound Medicare beneficiaries.

67.    For certain of GLHHS's homebound patients, GLHHS provided medical social services, which can include assessment of the social and emotional factors related to a beneficiary's illness, need for care, response to treatment, and adjustment to care.

68.     As described in more detail above, medical social services must be performed by a qualified medical social worker who has a master's or doctoral degree from an accredited school of social work and at least one year of social work experience in a health care setting.

69.     In or around September 2016, GLHHS hired Employee 3[5] as a medical social worker.

70.     GLHHS's employee file for Employee 3 indicates that, at the time of her hiring, Employee 3 disclosed that she had not yet completed her master of social work degree. Additionally, GLHHS's medical social worker qualifications list contained in Employee 3's employee file reflects the Medicare requirement that a medical social worker must have a master's degree from an accredited school of social work.  The GLHHS qualifications list also requires that a medical social worker must be licensed by the state or meet the requirements for licensure in the state.

71.     Despite the Medicare qualification requirements and GLHHS's own job qualifications for a medical social worker, GLHHS hired Employee 3 as a medical social worker.

72.     From around September 2016 through around February 2018, Employee 3 performed medical social work services for GLHHS's homebound Medicare beneficiaries.  During that time period, Employee 3 did not hold a master's degree in social work and was not licensed by the State of Michigan to provide medical social services.

73.     GLHHS submitted false claims to Medicare for the medical social services Employee 3 performed, even though she was unqualified to provide these services, including the following examples:

---

[5] The United States previously provided the name of this employee to Defendants, but, for purposes of this public filing, is identifying her as "Employee 3" to protect her privacy, including her employment history.

a.      GLHHS provided home healthcare services to Medicare beneficiary R.C. for an episode of care from approximately October 2, 2016, to November 25, 2016.  Part of these services included medical social services Employee 3 provided—despite her lack of qualifications—to R.C.  GLHHS then submitted a claim (Claim No. 21636502822607MIR) to Medicare for this episode of care, including the following medical social services work Employee 3 performed and the accompanying charges: (1) a patient evaluation on October 14, 2016 ($200.00); (2) a patient visit on October 21, 2016 ($200.00); and (3) a patient discharge on October 28, 2016 ($200.00).  This claim was false.  In total, Medicare paid GLHHS $5,086.06 for this fraudulent claim, which included the charges for the medical social services Employee 3 performed.

b.      GLHHS provided home healthcare services to Medicare beneficiary M.G. for an episode of care from approximately October 12, 2016, to December 10, 2016.  Part of these services included medical social services Employee 3 provided—despite her lack of qualifications—to M.G.  GLHHS then submitted a claim (Claim No. 21636500034707MIR) to Medicare for this episode of care, including the following medical social services work Employee 3 performed and the accompanying charges: (1) a patient evaluation on October 18, 2016 ($200.00); (2) a patient visit on October 25, 2016 ($200.00); (3) a patient visit on November 9, 2016 ($200.00); and (4) a patient discharge on November 16, 2016 ($200.00).  This claim was false.  In total, Medicare paid GLHHS $3,763.65 for this fraudulent claim, which included the charges for the medical social services Employee 3 performed.

74.      In addition to the specific false and fraudulent claims identified above, from about October 2016 through about January 2018, GLHHS knowingly submitted additional false and fraudulent claims to Medicare for the provision of home health services that included medical

21

social services Employee 3 performed, despite that she was an unqualified and unlicensed individual, and Medicare paid GLHHS for those false claims.

**E. GLHHS Directed an Employee to Alter the Dates on the Physician-Signed Certifications for Home Health Eligibility.**

75.     As described in more detail above, Medicare requires that a physician must certify the patient's eligibility for home health services at the time a plan of care is established for the patient or as soon thereafter as possible, as well as recertify the patient's continuing eligibility after an initial sixty-day episode.  The certification and recertification must include a signature and date.

76.     Typically, GLHHS would fax this certification or recertification to a physician for his or her signature within thirty days of the beginning of care.  At times, however, physicians would not sign and date the certification or recertification within those thirty days, and would return the certification or recertification with a date that was more than thirty days after the beginning of home health services provided to the patient.

77.     In order to avoid Medicare denying the home health services provided because the physician did not provide a timely certification or recertification, in or around 2018, GLHHS management personnel directed Employee 4[6] to alter the signed date on the physician certification or recertification for these untimely certifications.

78.     Specifically, at the direction of GLHHS management, Employee 4 used white out to alter the date signed by the physician, and then added a date within the thirty-day period after the provision of home health services.  Employee 4 then uploaded this falsified record into the patient's file and deleted the original certification that included the date the physician actually signed the certification or recertification.

---

[6] The United States will identify the name of this employee to Defendants prior to serving this Complaint, but, for purposes of this public filing, is identifying him as "Employee 4" to protect his privacy, including his employment history.

79.     In or around late 2018 or early 2019, Employee 4 confided to two other GLHHS employees that he was directed to alter the dates on the untimely-signed physician certifications and recertifications.  Employee 4 complained about how much time it took him to alter these records and showed the other employees a 1 ½ - 2 inch stack of records he had to alter.

80.     Neither Employee 4 nor any other GLHHS employee was a physician authorized to certify the need for these home health services under 42 C.F.R. § 424.22(a)(1)(v)(A).

81.     Because the vast majority of GLHHS patients are Medicare beneficiaries, many of these falsified records are believed to be in support of dozens of claims GLHHS submitted to Medicare for home health services.  These claims, and the dates of the underlying physician certifications and recertifications, are false and resulted in Medicare paying for these false claims.

### COUNT I –
### PRESENTATION OF FALSE OR FRAUDULENT CLAIMS
#### (False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

82.     The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

83.     As described above, Defendants engaged in a pattern or practice of knowingly submitting false claims for payment to Medicare, intending Medicare to rely upon these claims for payments.

84.     Defendants James Harvey and GLTH falsely billed Medicare by (1) submitting claims for reimbursement of physical and occupational therapy services to Medicare that falsely added additional units of therapy services not rendered, and (2) by submitting claims to Medicare for reimbursement of physical therapy services GLTH PTAs performed and Employee 2 purportedly supervised when, in fact, Employee 2 was on maternity leave and did not provide any level of supervision to the PTAs.

85.     Defendants James Harvey and GLHHS falsely billed Medicare by (1) submitting claims for reimbursement of home health services that included medical social services that an unqualified and unlicensed individual—Employee 3—performed, and (2) by submitting claims for reimbursement of home health services without an accurate or timely physician certification or recertifications of patient eligibility for Medicare home health services.

86.     Through the acts described above, Defendants presented or caused to be presented false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(A).

87.     At all relevant times, Defendants acted knowingly, that is, they had actual knowledge that the claims were false or fraudulent, acted in deliberate ignorance of the truth or falsity of claims, or acted in reckless disregard of the truth or falsity of the claims.

88.     The United States—through Medicare—paid Defendants for the false or fraudulent claims because of Defendants' conduct.

89.     By virtue of Defendants' false or fraudulent claims, the United States suffered damages and is therefore entitled to statutory treble damages under the False Claims Act, as well as a civil penalty for each violation.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

## COUNT II –
## FALSE RECORDS OR STATEMENTS
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

90.     The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

91.     Through the acts described above, and in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), Defendants made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

92.     Defendants made false statements in patient records and billing records, including false statements regarding (1) the nature of the services provided; (2) the identity or qualifications of the individuals actually performing or supervising the services billed, and (3) the dates of the physician certifications or recertifications.

93.     At all relevant times, Defendants acted knowingly, that is, they had actual knowledge that the records or statements were false or fraudulent, acted in deliberate ignorance of the truth or falsity of the records or statements, or acted in reckless disregard of the truth or falsity of the records or statements.

94.     The United States—through Medicare—paid Defendants for false or fraudulent claims because of Defendants' conduct, including their false statements and records.

95.     By virtue of Defendants' false or fraudulent claims, the United States suffered damages and is therefore entitled to statutory treble damages under the False Claims Act, as well as a civil penalty for each violation.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

## COUNT III –
## AVOIDS OBLIGATION TO PAY MONEY TO GOVERNMENT
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

96.     The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

97.     As described above, Defendants engaged in a pattern or practice of knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

98.     Specifically, Defendants James Harvey and GLTH knew that they received improper reimbursement from Medicare for claims falsely submitted to Medicare, including for claims submitted (1) for reimbursement of physical and occupational therapy services to Medicare

that falsely added additional units of therapy services rendered, and (2) for reimbursement of physical therapy services performed by GLTH PTAs and purportedly supervised by Employee 2 when, in fact, Employee 2 was on maternity leave and did not provide any level of supervision to the PTAs.

99.    Similarly, Defendants James Harvey and GLHHS knew that they received improper reimbursement from Medicare for claims falsely submitted to Medicare, including for claims submitted (1) for reimbursement of home health services that included medical social services performed by an unqualified and unlicensed individual, and (2) for reimbursement of home health services without an accurate or timely certification or recertification of patient eligibility for home health services.

100.    Despite knowing that the reimbursement received from Medicare for these services was improper—because the payment was induced by false claims Defendants made—Defendants retained this improper reimbursement and did not pay it back to Medicare.

101.    At all relevant times, Defendants acted knowingly, that is, they had actual knowledge that they were concealing or improperly avoiding or decreasing an obligation to return the money to Medicare, acted in deliberate ignorance as to these obligations, or acted in reckless disregard of these obligations.

102.    By virtue of Defendants' concealment, avoidance, or decreasing of their obligations to return the fraudulently obtained reimbursement monies to Medicare, the United States suffered damages and is therefore entitled to statutory treble damages under the False Claims Act, as well as a civil penalty for each violation.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.

## COUNT IV –
## COMMON LAW FRAUD

103.    The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

104.    As described above, Defendants engaged in a pattern and practice of making false statements and false claims for payment to Medicare, intending Medicare to rely upon these statements and false claims for payment.

105.    Defendants James Harvey and GLTH falsely billed Medicare by (1) submitting claims for reimbursement of physical and occupational therapy services to Medicare that falsely added additional units of therapy services rendered, and (2) by submitting claims to Medicare and falsifying underlying medical records for reimbursement of physical therapy services GLTH PTAs performed and Employee 2 purportedly supervised when, in fact, Employee 2 was on maternity leave and did not provide any level of supervision to the PTAs.

106.    Defendants James Harvey and GLHHS falsely billed Medicare by (1) submitting claims for reimbursement of home health services that included medical social services an unqualified and unlicensed individual—Employee 3—performed, and (2) by submitting claims for reimbursement of home health services without an accurate or timely physician certification or recertifications of patient eligibility for Medicare home health services.

107.    These false statements, claims, and billings were misrepresentations of material facts.

108.    Defendants knew, or should have known, that the false statements and false claims described above were false and fraudulent when they made and presented them.

109.    Defendants concealed material facts from Medicare.

110.     Defendants made their false statements, claims, and billings and concealed material facts intending to deceive representatives of Medicare into reliance upon them and into paying false and fraudulent claims.

111.     The United States relied upon Defendants' material false representations and made payments to the Defendants based on those representations.

112.     As a result, the United States has been damaged in an amount to be determined at trial.

**COUNT V –**
**UNJUST ENRICHMENT**

113.     The United States realleges and incorporates by reference the allegations of all of the preceding paragraphs of the Complaint.

114.     Defendants James Harvey and GLTH falsely billed, and obtained monies from, Medicare by (1) submitting claims for reimbursement of physical and occupational therapy services to Medicare that falsely added additional units of therapy services rendered, and (2) submitting claims to Medicare for reimbursement of physical therapy services GLTH PTAs performed and Employee 2 purportedly supervised when, in fact, Employee 2 was on maternity leave and did not provide any level of supervision to the PTAs.

115.     Defendants James Harvey and GLHHS falsely billed, and obtained monies from, Medicare (1) by submitting claims for reimbursement of home health services that included medical social services an unqualified and unlicensed individual—Employee 3—performed, and (2) by submitting claims for reimbursement of home health services without an accurate or timely physician certification or recertifications of patient eligibility for Medicare home health services.

116.     By directly or indirectly obtaining these monies to which they were not entitled, Defendants were unjustly enriched with federal monies to the detriment of the United States.

28

117.    Defendants have received a benefit from the United States and an inequity to the United States has resulted because they have retained the benefit.

118.    Defendants are liable to account for and pay these amounts, or the proceeds from them, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

The United States demands and prays that judgment be entered in its favor, and against Defendants, as follows:

1.    On Counts I, II, and III under the False Claims Act, for the amount of statutory treble damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On Counts IV and V, for common law fraud and unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

Dated: May 27, 2021                              Respectfully submitted,

                                                 ANDREW BYERLY BIRGE
                                                 United States Attorney

                                                 /s/ Andrew J. Hull
                                                 ANDREW J. HULL
                                                 RYAN D. COBB
                                                 Assistant United States Attorneys
                                                 U.S. Attorney's Office
                                                 Western District of Michigan
                                                 P.O. Box 208
                                                 Grand Rapids, MI 49503
                                                 Tel: (616) 456-2404
                                                 E-mail:  Andrew.Hull@usdoj.gov
                                                 Email:  Ryan.Cobb@usdoj.gov